Thank you for joining us. I just called the case. I want to say that we have been referring to this case as United States v. Ahmad. I hope that's okay. And with that, we're ready to hear your argument if you're ready to begin. Sure. I would add that my client has always denied being Mr. Abrahim Al-Ahmad, which is the name under which he was extradited and originally indicted. He was initially indicted. Excuse me, the clock should be running. Go ahead. Okay. Sorry, let me start. May it please the court, my name is Molly Carlin. I am an to him as Mr. Oklah, and I won't waste my time talking about names. I'd like to reserve five minutes. Now, the two pillars of the government's case were its key star witness and its key expert. Now, its star witness, who was Mr. Oklah's main accuser, never faced the jury. He never received any benefits from the government, was never challenged by later disclosed evidence showing that he received significant benefits, and the crux of his testimony, that part implicating Mr. Oklah, was inadmissible hearsay. You've packed a lot into your first sentence. Could I start by asking, how do you differentiate between... You're saying there's one star witness, but there was also Olliwe's. How do you distinguish the two? Olliwe's testimony was completely inconsequential. He was unable to identify Mr. Oklah. He... Oh, he did identify. There's a discrepancy about the two different pictures, the picture on the laptop. I think you're referring to that part of the transcript, right? Well, he was unable to positively identify any picture of Mr. Oklah. He identified the picture that was purportedly of Mr. Oklah, first as he thought first it was Mr. Oklah, and then he said, well, maybe it's the guy I know as Lieutenant Ahmad. So I really wasn't... I'm really not sure. And so his testimony was really neither here nor there. And I think that's why neither party in their briefs focused on it, and why the government has conceded that all of our confrontation clause arguments, our hearsay arguments are not harmless. So I think Mr. Olliwe's is wholly inconsequential to this case. So I wanted to... Next thing packed into that first sentence had to do with the jury and whether he was confronted, whether Ollivari was confronted. So could you speak to that? Because it was a joint motion, of course, to take the deposition to perpetuate it for trial. Could you speak to that? Sure. So joint motion was made based on the party's... Based on the defense's understanding given to it by the government and represented in the joint motion that the joint motion was about three witnesses, a defense witness and two government witnesses who were unidentified, who the government refused to identify prior to the filing of the motion. The motion refers to them as witness A and witness B. Those witnesses turned out. Is that important, that witness A, witness B point out? I want to miss your point. So yes, it is. And I'll get to that. So they were unidentified. So the defense relied on the government's representation that these witnesses could not come to the United States and were substantially unlikely to be filed. Based on those representations, the defense agreed to foreign deposition. Now, in the joint motion... And the defendant wanted to take one of those depositions, right? Well, the defendant wanted to take the deposition of the defense witness, which was never taken for... I won't go into it, but for reasons that we later contended was also substantial interference by the government. So that witness was never taken. And I will note with respect to that, that again, I don't want to go too far into it, but that the government argued that the motion, the representations in the motion weren't binding because our witness's testimony wasn't in fact material despite the representations in the joint motion that the witness was material. But in any case, going back to the joint motion, the defense agreed to the motion based on the government's representation that the witnesses could not be available for trial and could not come to the United States. In fact, at the time the joint motion was filed and Judge Silver found this, the government knew that Mr. Aldari was coming to the United States and they had in fact made plans to interview him. They had facilitated his travel to the United States. And the defense counsel knew that before the deposition started. The defense counsel knew at the time of the deposition that he had secretly been in the United States and that the government had secretly allowed him to leave. However, that is not a waiver. It's something that Judge Silver asked about. She said, why didn't the defense counsel object? And I think the response was that, well, the other part of the deal was that we were going to get our witness's deposition too. And then that didn't happen for reasons you've alluded to and that I think we fully understand from the record. Right. I think it's not entirely clear from the record, you know, why an objection wasn't made. That may have been part of it. That said, there couldn't be a waiver in it. Well, first, the defense's witness's deposition was not taken. Again, due to what we contend was a fault. Again, of the government. Which would have breached the, if there was an agreement, breached the agreement and then we got nothing out of the agreement. But also, there couldn't be a waiver there because the defense had no way of knowing first that there would be undisclosed Giglio and Brady material that would directly go to Mr. Aldari's testimony and the credibility of his testimony. Are you referring to the two visa applications and the consular memos and the third seat association? Yes. Okay. So, of course, the defense at the time of the deposition couldn't have known that. So, there's that get us. I think that's right. And I appreciate that those documents were produced, I think, a week before trial or something, just really in close proximity. The government has a So, it's not as though there was a representation that as of the time of the deposition, all of the discovery would be completed, nor could there have been. I'm trying to unravel this and try to figure out what exactly is your strongest argument on this point. You know when you got the documents, are you arguing that the government delayed in producing them when they came to the government? Well, yes, certainly. I mean, the government knew the case agent was the one who facilitated his travel to the United States. The FBI facilitated it. I'm asking a more specific question, but I'm not doing a very good job of asking it. I'm talking about the documents in particular, not their knowledge of them, of the travel, just the documents in particular. Is it your argument? The one you have made is that you got them late, and I think you described it as on the EVA file. My other question is whether you're further contending that the government delayed in producing them. I don't think that's necessary to our argument, but certainly the government knew long before his deposition that those documents existed, that the visa documents existed, because they had facilitated. The government argues, as you know, that they offered to stipulate that all those would be admitted, and I think that defense wound up using the visa, I don't know if they were used or not, but admitting the visa applications and not the other two. Is that right? Yes. Okay. That's wholly inconsequential to the confrontation clause, because the purpose of confrontation is for the jury to be able to evaluate the witness's demeanor. The point was not to... Right, so you lost the gotcha moment, right? Right. With a key witness, that's certainly very valuable, and there's a delta there between that moment in front of the jury and what I think you would have been left with, which is to argue to the jury of presumably something along the lines of, you've heard his sworn testimony, and now the government admits, agrees to the following facts, something like that. Arguments don't show me that the defendant made that type of argument, the one I just sort of humbly paraphrase. Is that right? Well, I'm not sure what you mean about whether the defense... Did the defense argue on those three documents that the government stipulated to admitting that the jury was in a position to see that Aldari had testified falsely? Well, the jury didn't see the consular memos or the FIPA, but that doesn't go to the confrontation clause, even if the defense did argue, and the defense did argue that he was a liar. I fully appreciate we're not on NAPUA. I guess that we're talking about the confrontation clause, but my question is, I think, and you've answered the first part, defense used these applications. Did the defense, or at least agreed to have those admitted? Did the defense argue that Aldari had lied on the basis of those documents? You couldn't do the aha moment. You couldn't catch him in the act of lying, I think is what your argument is, and ask me whether you did the fallback, which is argue that he was lying, and that the jury should infer that because of the visa application. Well, those weren't in evidence, so we couldn't argue that to the jury. Of course, we argued that... I thought you just said that the visa application was in there. Oh, yes, the visa application was in evidence, but it's important to note that because that only came to evidence by stipulation, it appears to have been lost in the jury because the jury asked what benefits did Aldari receive, and in fact, the visa application shows that... Yeah, so that doesn't actually answer Judge Christen's question. I have the same one. Was there an argument made to the jury that a document, a piece of paper, shows that yes, they were... Yes, it was argued to the jury that it was shown that he was a liar. However, the key point was not to show that he was a liar about any particular fact, that he lied about any particular fact, but for them to evaluate his demeanor when confronted with his testimony implicating Mr. Okla. Well, typically, there is an instruction given that a witness false in one thing can be considered false in others. I'm paraphrasing. Was that type of instruction given? I assume so because I believe that's a standard instruction. I would have to check if that is a standard instruction. So pointing out one lie would have allowed counsel to argue exactly what the instruction says. Now that you know that he's lied about this document, you need to distrust everything he has said. Sure, but I think what you are getting at is harmlessness, and the government hasn't argued harmlessness. This was a confrontation clause violation because Mr. Okla was not able to confront Mr. Aldari with the documents. Of course, in addition, Mr. Aldari was not unavailable, and that's so for three reasons. One is the lack of opportunity for cross-examination on those late-to-close documents that we discussed, and the other two were that he was not available for trial. So the first reason is that the government admits that it intended only to take his foreign deposition and that it never expected that it had to make him available for trial. Well, if that was the case, then when it said in the motion that a foreign deposition was necessary because Mr. Aldari could not come to the United States, that was an intentional attempt. But didn't it say he may not be able to come? They wanted it to perpetuate. I think it's very clear, certainly from the judge's order, it was very clear that it was to be taken to perpetuate for trial because he may not be able to come to the United States. Was that wrong? Factually inaccurate. That was misleading. What the government said in the motion was foreign depositions are necessary for a just resolution of the case, and under Carter, they have to be absolutely necessary, that there are no significant countervailing factors that would render the taking of the depositions unjust, that because defendant is detained, he cannot be physically present at the depositions. These were misleading. In addition, a foreign deposition under Rule 15c cannot be ordered under these circumstances if the defendant can be present in the deposition and if the witness can be present in the United States. So by allowing Mr. Aldari to come to the United States, facilitating his travel to come to the United States secretly, and then allowing him to leave, on that basis alone, under EDA, which importantly adopts MAN, he cannot be deemed unavailable. In MAN, and EDA fully endorses MAN, and in the district court below in EDA, which is a decision the Ninth Circuit adopts, once the witness has been in the United States and the government allows them to leave, without making any effort to bring them back, or to incentivize them to come back, without serving them with a subpoena, without telling them they have to come back and getting insurances that they will come back, it's too late. In MAN, the government simply, unbeknownst to the defense, returned the witness's passport, returned her plane ticket, she left, and the MAN court said, any steps taken thereafter were too late. So the court can stop there, under EDA. But it gets worse for the government, when you consider what it did thereafter, in that it took no steps to even determine his availability, until mid-January, we're talking about trial schedules for late January, when the district court ordered it to make an effort... The district court found the government's statements had been misleading, and she ordered them to try again. Yes. And at that point, when they spoke to him, he didn't say, look, we really need you here for trial, they didn't... So, let me step back, their burden, it is the government's burden to show that they made reasonable and good faith efforts. The court found that they made good faith efforts. She did. That was legal error, because under EDA, the district court... Why is good faith, in the circumstances, a legal question, rather than a factual question? If someone acts in good faith, or acts in bad faith, isn't that normally a factual issue? Well, in this case, the district court, under EDA, was required, as a matter of law... To make a finding, and the finding was that there was good faith. So, don't we review that finding for clear error? Normally, you would. However, the district court made legal error, in terms of the law that she applied. She only considered the government's actions, immediately preceding the trial. Yet, a whole government... That the court must consider the government's actions, both before the witness leaves the country, the United States, and after. Judge Silver did not consider... Well, she did. She found that the representations had been misleading. She went back to the beginning, right? She said it was misleading, when you said this was absolutely necessary. Because you didn't disclose, I am paraphrasing, that he was coming, and in fact, did come to the country, and I think Mark took that here. Right, but she didn't consider the fact that they simply let him leave. She didn't apply the correct law, in looking at EDA, and considering the fact that they simply let him leave, without making any effort to... Without telling him he needed to come back. They could have withheld his passport. They could have conditioned his initial visa, on his agreement to return for trial, in the first place. They could have conditioned his pending second visa, when he told them that he would be coming back to the United States. They could have conditioned that visa on, oh, we understand you're coming during trial. Well, great, if you want that visa... Did you make those requests at the time? In January, did you make these objections to the trial court, and ask the trial court to order those conditions to be imposed? The government... We didn't have the opportunity to do that, because the government... Excuse me, the court ordered the government to make their every effort for him to be here. They then spoke to him. They didn't say, we want you to be here. They said, the court changed its mind. The court wants you to be here. They made the court sound very unreasonable, and then... What do you base that on? The... The conclusion that they made the court sound unreasonable. Why isn't it even stronger to say, the judge demands that you're here. I mean, that seems to me quite a bit stronger than saying, we, one of the parties, would like you to be here. Well, they said, instead of saying that the law requires you to be here, what does Mr. Aldari care about what the judge thinks? He's been wanting to impress the government the entire time. And what the government said was, well, the court changed its mind at the last minute, so you should really come. And he said, well, you know, that would be politically embarrassing for me. And the government said, well... And then he said, but I do have a trip planned. And at that point, the government could have said, and he said, I have a pending visa. The government could have... An application, a visa application. A visa application. The government could have said, they could have said a number of things. They could have said, well, great. Why don't you, when you land, give us a call and we'll have a They could have said, okay, well, you know, that's great that you have a visa application pending, and we will help get that visa granted, provided you agree to come to trial. They could have, before he left in the first place, they could have served him a subpoena. Yes, it would not have been enforceable abroad, but it would have been enforceable by prosecution after. And given his political aspirations, both in Iraq and wanting to, you know, get, you know, make connections on Capitol Hill, it seems unlikely that he would have wanted, you know, and that he wanted to come back. It seems unlikely he would have wanted to risk criminal prosecution. I'm concerned about the time, and I'm really anxious to hear your extraterritoriality argument. Are you going to speak to that? Sure. I would like to speak on competition, so I have a little more of your time. You do, absolutely. Sure. And I guess, and I would like to talk about extraterritoriality, but I do want to point out that the government's burden here is not to show that they gave him a call and he said no, and that's that. They have to show that they made efforts as strong as they would have made if they did not have a deposition in hand. Now, Mr. Aldari's testimony on this record, at trial, was dispositive for him. He's dispositive. He was the only one to connect Mr. Okla to a conspiracy to attack America. What about Olliewood? Olliewood's testimony was inconclusive. You keep saying that, but do you really think there's no other evidence connecting your client to the conspiracy other than Aldari? Yes, there was no other evidence connecting him to the brigades or to a conspiracy to attack Americans. The evidence at Omar was, even if the jury believes... What about, I don't want to take a whole lot of your time, but what about Olliewood's testimony about the Abu Ghassan and how, you know, after he was captured, then there was this conversation about, or Ahmad asked, who's going to take his place? And then he came to the village with the demonstrating that that would be an explosion. What about that testimony? I'm summarizing, but I just want to give you a chance to respond. How does that not tie into the conspiracy? Olliewood said he didn't even know what the box was for. He understood it was for explosions. He didn't really... He had no personal knowledge. All the stuff about Abu Ghassan was not supported by anything else. It was just his word that this... It would have been the testimony of a co-conspirator. There was no... And ultimately, he didn't connect... He ultimately didn't connect Mr.... He didn't connect Mr. Okla to anything. And I guess I'm just a little confused because this was not a whole... This was just not the thrust of the government's case at trial. The government focused on Mr. Aldari and Horace. That was their case. And Claire, those were very important witnesses in one case. A hearsay witness for sure. I'm just responding to your statement. There was no other evidence tying your client to the conspiracy. Okay. I think that evidence would be so inconsequential as to not support... The case would not... There would be a very strong chance of a different verdict without Aldari. Ollie Weiss would not have made the case for them. And so I just want to add with respect to the unavailability that the government had at least one more chance to try to get him here. Agent Woodson testified at trial that Aldari's representative called him and said, hey, can I ask you a favor? Could you call me and let me know when trial is over so that Mr. Aldari can schedule his trip? Reschedule his trip. I would also like to hear about extraterritoriality. And you're down to five minutes, including any rebuttal time. And I have one specific question for both counsel. And even though the US attorney is representing the government here, is this a situation in which the court might benefit from a briefing by the State Department on what its view is of the extraterritorial application of 844F? I'm not sure how that would add anything that the government hasn't already said. With regard to extraterritoriality, I think it's pretty clear from the briefs that this court has already applied the RJR 2-STEP to criminal cases and that the second prong relates to conduct. And if it's purely extraterritorial conduct, then the government loses step two. So the question is step one. And so at step one, we ask whether the presumption, there is a presumption, because the court has applied RJR Novisco. So has the presumption been rebutted? And the Supreme Court has been very clear that it's the rare case where it's been rebutted and that it has to be unmistakable. And I don't want to go too far into my rebuttal time, but RJR, it was unmistakable because when you looked at the definition of racketeering activity, that included statutes that explicitly are extraterritorial. And so here the government is asking for an inference based on what Congress might have thought or Congress could have thought. And that's not... Because your time is running, let me jump. We've got Bowman sitting there. It's a century old. It's a Supreme Court decision and the Supreme Court hasn't itself overturned it. Is there a single logical reason why the United States government should be less concerned about the risk or destruction of government property outside the territorial boundaries of the United States than it is concerned about destruction of US government property within the boundaries of the United States? Well, I want to say with respect to Bowman, the Supreme Court just hasn't had an opportunity to address that. And maybe this case will give it to them. Maybe it will. With regards to... Is there a reason why the government should care less about destruction outside the US? Yes, because it can be prosecuted and presumably would be helped to do that. And they may well think that in the Garcia Soto case. Destruction in the United States can be prosecuted by a state too. And yet there are federal statutes, this one in particular, that make it a federal crime. Why would the US government, why would Congress be less interested in protecting US property elsewhere? Is there a reason? I haven't found one. I'll say the Supreme Court wants it to be unmistakable so that Congress can legislate. There's no logical reason. It just hasn't been said in the statute. Is that what your argument depends upon? Well, it's not clear to Congress. I would say that Congress may not want to extend extraterritorial jurisdiction over statutes that may not be... That may be less important. It's not as interested in protecting government property outside the United States. Well, they may not want to extend it over lesser crimes. The Garcia Soto case involved murder of federal agents. And then in that, when Congress amended it, they included additional statutes that went to that kind of serious violent crime. They didn't just amend it. Congress will have its way to say, this is what it's always meant. Right. But the Supreme Court has said that what present Congress says about what a past Congress is irrelevant. And so I'd like to reserve the remainder of my time. Thank you, Your Honor. And may it please the court, Jeffrey Smith for the United States. A couple of questions just so that I don't forget. Sure. What happened to 844F2? 844F2 was not charged. I mean, it was charged in the indictment, but it was not... We didn't make that... You actually had a proposed jury instruction, and then the jury wasn't instructed on F2. I'm just trying to figure out what happened. You know, Your Honor, I'm not sure what happened there because it hasn't been raised in this appeal, but it was not charged. The reason I mentioned it is because it was raised by the judge at the time the judge looked at extraterritoriality. I just noticed that he treated that as addressing F2. Is that significant? I don't think that it is significant. I think, you know, as... F2 comes a lot closer to Garcia Soto, right? Because I talked about injury to US government employees. Well, first, Garcia Soto is a DC circuit case, and it was directly inconsistent with the law in this circuit, as well as the 11th and 2nd Circuit, as you're aware. Yes. So the... I don't think that the... Well, I guess... That's my point, Counselor, because the Congress responded to Garcia Soto, and was responding there to a statute, 1114, that, of course, really talked about with no mention of extraterritoriality, that they criminalized, I think, injuring, certainly killing, government officials who are, you know, carrying out their duties. So that comes a lot closer to F2, and to a statement of what Congress would have intended regarding F2. But you don't think this is fairly part of our analysis? Well, I don't think it's ultimately relevant here. The analysis in Bowman, which this Court has adopted in a number of cases, looks at whether the statute protects government interests specifically, as opposed to generally regulate the citizens. Counsel, that's where I have a question about the text of the statute. The text is a lot broader than the U.S. government. It's also equally a crime to damage or destroy, or attempt to damage or destroy by means of fire or explosive. The property of any institution or organization receiving federal financial assistance, and two and three deal with the injury or death of any person. So, you know, University of Arizona program abroad, they receive federal money, or assuming that university receives federal money. Someone blows up the university's building and injures a local. Why is that extraterritorial? And if it isn't, how do we parse this statute as applying sometimes abroad and sometimes not? So I don't think it's necessary to parse the statute. The thrust of the statute is protecting the United States' interests as the United States, as opposed to protecting the interests of the United States in governing the citizenry. So all of what we're talking about here- So you think Congress meant, in my hypothetical for this statute, to allow a federal prosecution here at home of a foreign national who blows up a university facility and injures a foreigner on foreign soil because the university happens to receive some federal funding. You think that's what Congress meant? I do, but obviously the court doesn't have to reach that in this case. Why not? I'm not so sure we don't. That goes to the other question about parsing the statute. And before you get to that, let me just ask tangentially, are you aware of the Sidorenko case? It doesn't ring a bell. Judging District of California. Okay. Is that ringing a bell? A UN agency, 25% funded by the US. It kind of goes to Judge Graber's hypothetical. It's a district court decision, and it declined to extend extraterritorial application. The government did not appeal, actually did appeal, but then eventually voluntarily dismissed its appeal in that case. That's the closest I think we've come to Judge Graber's hypothetical. But it sounds like you're not familiar with that case, so I should leave it. Is that right? No, we're happy to submit further briefing if you direct us to. Okay. Well, let me just circle back, because I didn't need to hijack Judge Graber's question. She and I have the same one. If you can circle back and look at the language of the statute, the premise is that it's broader than just protecting the US government's interest, because it purports to extend to other entities like the one in Sidorenko, which is funded in part by the US government. Or in Judge Graber's hypothetical, what was it? The study abroad program at the University of Arizona. What about that? And also, when it says any person and any public safety officer, this doesn't say United States public safety officer, unless it's assumed that it doesn't apply extraterritorially. Okay, so let me try to then parse this out. The provision at issue here states that criminalizing, destroying, or destroying by means of an explosive any building, vehicle, or other personal or real property in whole or in part owned or possessed or leased to the United States or any department or agency thereof. I know, that's why you want to stop, but my problem is when we're looking at congressional intent, they wrote the whole thing. They didn't just stop the sentence where you stop the sentence. They wrote this whole thing, and when you read the whole thing, it either applies, it seems to me, I'm not sure how we would interpret it to say, Congressman, half a sentence to apply extraterritorially, that word is always hard to say, and half isn't, or half is, and maybe we don't know if the other half is. That's my problem. It seems to me we have to read it as a whole. Well, Your Honor, I think I would look to the language in Bowman, which is where the statutory provision, and this is very specific about protecting United States property. It's good policy. I'm not arguing with you about that, but it seems to me that we have to find that that's what Congress meant, and at least when it was initially enacted, that isn't what you can infer when Congress specifically states the United States as victim is an element of the crime, but you can infer that that would apply extraterritorially because there's no logical reason why Congress would want to allow blowing up tanks or killing U.S. servicemen in the United States, or would want to allow it in Iraq but not in the United States. Of course, the United States disallow that, and its property is often in countries where a local prosecution may not be forthcoming. I don't think it's very suspenseful. I'm only one of three. I don't think it's very suspenseful how the Congress would answer this question if we ask Congress right now, and the Supreme Court has said very specifically we're not allowed to engage in that kind of speculation. We have to look at the question of statutory interpretation. We have to look at the statutes that they enacted. Yes, Your Honor, that's absolutely right, but Bowman says that where you have this type of language, that is an indication that it applies extraterritorially. Right. Now engage, if you would, please, with Judge Weber's question. It's not just that language. There's more language in there that suggests a broader, a much broader scope. What do we do about that, please? Well, I guess I may be repeating myself. I don't think you need to engage with the language that wasn't charged in this case. But we do have the question of statutory interpretation. We have three choices. We can say the statute always applies extraterritorially. We can say it never applies, and we could say it applies half the time, and I'm uncomfortable with that third option. I'm not really sure where that would come from, but it seems to me unlikely that Congress meant it as broadly as would cover everything that could be charged in this statute. There's an example where we've done that with statutory interpretation or any of these cases, and now we've read a whole lot of them. Right. When any court has looked at one of these statutes and said there was an intent, we think that presumption is overcome to the extent that it addresses the criminalized conduct where the U.S. government would be the victim. I don't know that I can find your exact language, but I would point the court to the District Courts of D.C., which, of course, is applying the more difficult standard that the D.C. Circuit uses. In Abu Qatala, a case very much like this involving the exact same statute, in a very well-reasoned opinion, the court explained why tax on United States property, and there was an attack on the consulate in Benghazi, why it applies extraterritorially. That would be my answer to your question. I would like to turn, if I could, to the Aldari deposition. Before you do, what is your answer to my question about whether it would be useful or in any way appropriate for us to seek the view of the State Department on the extraterritorial application of the statute? Well, Your Honor, I'm always happy to do more briefing if it's helpful to the court. In terms of, you know, the State Department doesn't act in the courts apart from the Department of Justice, but if your question is to ask us to go to the State Department and get a letter from, and ask them if they can do a letter or something, you know, we can look at that. It just seems to me that they may have a view on whether the statute, either in whole or in part, ought to apply on foreign soil, because it applies to countries that we're friendly with, countries we're not friendly with. There may be concerns that we're ignorant of. I'm happy to do further briefing in the court direction. I don't think there's ever been an issue with applying these types of laws, and by these types of laws I mean laws that protect government property or government personnel operating abroad, and criminally prosecute attacks, deliberate attacks on those things. But, you know, as I say, I'm happy to do additional briefing if that's something that would be helpful to the court. If I could turn to the Aldari deposition, I want to make a couple of, well, I want to start with one very important point. This was a Rule 15H deposition. It was not a Rule 15A deposition, and therefore Rule 15C doesn't apply. It was a 15H. It was a 15H deposition, and under Rule 15H, the parties, the district court can always order a deposition if the parties agree, and the district court can order both the taking of a deposition and the admission of a deposition in lieu of live testimony. Now, there was never any representation that any of the witnesses, whether it's Aldari or whether it's Ms. Goh, who was the defense witness, didn't have passports or couldn't come to the United States. The understanding of both parties was that they were not within the subpoena power of the court, and they may not be available at trial, and as it turned out, none of them were available. Judge Silber found the government's position to have been misleading. I respectfully disagree with Judge Silber, but I will note that what she did as a result was she did not hold the defense to their agreement as to the admissibility, and so what she did was she applied the standard rule that applies to prior testimony that a party wants to admit, and that's the Crawford versus Washington test, and she applied that test and she applied it correctly. I'll note, I do want to note, again, on this misleading thing, the defense was aware that Mr. Aldari had been in the United States. They were aware of that a month before the deposition. As I indicated in one of my questions to opposing counsel, we're aware of that. Yes, and what it shows is that this was a strategic calculation. The defense thought that the government would not be able to get helpful testimony and that they would be able to get helpful testimony. Ultimately, and I do take exception to what they said about the third party witness, although it's not raised here, that was litigated below. The defense, Ms. Glow just didn't show up for her deposition. The defense argued that the government shouldn't have told authorities in Hong Kong, but that's absolutely something we cannot do. We've been through that part of the record, and opposing counsel didn't press that point here. Let me ask you this. If we were to find a confrontation file violation, opposing counsel argues that the government has waived its harmlessness argument. I guess it depends on the nature. We do not argue that the admission of the testimony in whole was harmless. I don't agree with the characterization that it was the entire case. There's actually a tremendous amount of evidence against the defendant in this case, including, as you say, the alleyways deposition and the fingerprint evidence, the physical evidence. I'm going to come in a minute to other evidence, but could you focus on this? I'm not sure. I just want to be really clear on this point. Opposing counsel argues that you waived harmlessness if we find a confrontation clause violation. I just want to make sure. I want to be clear. We are not arguing that the admission of the testimony of Aldari was harmless. If the court rules that the deposition should have been excluded, we're not saying that harmlessness is a reasonable doubt. As I say, in any event, the admissibility of prior testimony is governed by Crawford v. Washington. There's two parts to the Crawford v. Washington test. The first is that the witness is unavailable, and the second is that the defendant had adequate opportunity to cross-examine. That's the one I'm hoping you're going to focus on. Sorry? That's the one I hope you're going to focus on. Okay. Well, the defendant did, in fact, cross-examine the witness. The defense points to certain documents that were produced after deposition but before the trial, and I assume that's what you want me to focus on. The two visa applications, the consular documents, and then the substitution, that's what was produced. Yes. The prosecuting team wasn't aware of these documents until shortly before trial, and they immediately brought them to the judge's attention. Judge Silver made an explicit finding on the CFA documents that the government had produced in a timely way, and the same is true of the other documents. The closing counsel, if I can just sort of shorten this, we have case law recognizing that there's nothing quite like getting a key witness on the witness stand and pointing out an inconsistency. This isn't about bias. This is about veracity, about catching someone in a lie on the witness stand, and that's the delta she's arguing that her client missed out on. Could you speak to that, please? Well, Your Honor, they haven't established any lies. They keep saying the government arranged for him to come to the United States. In fact... I think her strongest lie, if I might, and again, I'm only one of three, but if it helps you use your time carefully... Yes. I think the strongest argument is that he testified in a way that was misleading, at least, because they dodged the question when asked whether he was a member of the brigade. And the CFA, the government, winds up coming out and agreeing that he was actually a commander. Okay. So, yeah, I would like to address that. Thank you. So he was asked, are you a member of the brigade? He didn't answer yes or no, as you say. He said the brigades are a military organization. The members are the people on the ground doing the fighting, and the people outside the country who are supporting them are not members of the brigades. However, he made clear, and then the next question... He didn't have a title. Well, he did say that, but shortly thereafter, the next question was, did you do work both inside and outside Iraq? And his answer was yes. So he did, in fact... He didn't say he wasn't a member, but his deposition testimony, and I do suggest you read all the way through, or at least the part that was admitted to trial. It's pollutedly clear that he is a part of the brigades. Over and over again, he talks about, we did this. We wanted to fight against the Americans. Okay. In the same breath, he's talking about his pride for his family tradition, we as a family. I don't know that it's so clear. I respectfully disagree. For example, he says... You're also assuming I haven't read it all already. Oh, I'm sorry. That's okay. But I think we've both read it all already, and so what's your strongest point? I'm not trying to give you a hard time, but what is your strongest point? I think it's all the way through the deposition, but give you an example. He says, when he's talking about the email he received from the defendant, he says, so actually, the reason for that, because we don't need a lot of those transmitters, but we were in need more of those receivers. And the reason why, because those receivers, they get damaged by the bombs very quick. That's why we need more pieces of them. I thought membership didn't have a base. I don't... I just think that the membership issue is a red herring. It's like somebody who supports the armed forces, like, for example, Mr. Graham, who's in Iraq, or maybe they're in the United States, and they're supporting him. They're saying, no, I'm not a member of the armed forces. I don't hold a rank in the armed forces. But from the purpose of what's going on here, that doesn't mean they're not a co-conspirator in the overall struggle, if you will, or terrorist activity. Not talking about the membership and the conspiracy, although that's on my list of but maybe you've answered as well as you can. The question had to do with why shouldn't we decide that Aldari was misleading on this point about membership and the brigades? Maybe that you've given me the best answer you've got. No, I just think that one can't be misled. And the other fact I would point out is that it's a harmful answer to the government, the fact that he's not a member, because the government's position at trial was that Aldari is a co-conspirator with the defendant, and that they, along with Harith Aldari and others, were part of this conspiracy to use IEDs against U.S. forces. You make that argument in the Pooh claim, but the question isn't which way it cuts. The government has an absolute obligation to correct false or misleading testimony. And in this particular case, it is concerning, Counsel, because this deposition was, as you know, very well, it was perpetuated in July. So there were lots and lots of months to think about it. And there was, in fact, there was a motion to strike that was raised in November. So this isn't a case where a witness blurted something out on the witness stand. I want to give you an opportunity to respond. I think what you're telling me first is that you don't think it was misleading. If I disagree with you there, and I think what you're really telling me is you think that wasn't very important. Well, so I don't think it's misleading in the whole, both of his testimony. I think the government did attempt to immediately elicit his participation in the conspiracy and work with the brigades immediately after that. And the FBI agent, Mr. Whitson, testified that he was, that he believed that Aldari was a member of the brigade. So I think the government, I suppose, in retrospect, maybe striking that question would have obviated this appeal issue, but it wouldn't have made any difference to the trial. Could I interrupt you and ask whether there was any request that any part of Aldari's deposition be edited before it was laid to the jury? I don't believe there was any request on that ground. The defense raised a series of objections. Well, they set them out in the deposition and it was brief. And the judge went through on a sort of line by line basis and decided what would be, which objections would be sustained. And in some cases she actually cut things that the defense hadn't even objected to. But so there was litigation on the general issue of what parts would be allowed in. I don't believe there was any request that that answer be cut on a NACU ground or anything similar to that. Can I get you to change focus? There was a representation made earlier that Aldari was really the key witness, a very key witness. And I had asked about Olliwe. What is the other evidence other than Aldari that tied a lot to the conspiracy plea? So the Olliwe's evidence is much stronger than I think counsel was able to admit. I take what she was saying to be more jury argument than, well, I take it to be essentially a jury argument to not believe Olliwe's testimony. And they made a similar argument below. The additional evidence includes a massive amount of physical evidence from the Omar site and elsewhere. At Omar in particular, there were over a thousand of the defendant's fingerprints found, personal documents of his, including one with his picture saying Ahmad Ibrahim Ahmad. And there was documentary evidence, including a document explaining how to use cell phones to detonate IEDs that had his fingerprints, 30 of his in making IED equipment is really overwhelming. Specifically his involvement in the conspiracy in assisting the brigades in doing this, as opposed to manufacturing these instruments for anybody else. So, yeah. So in terms of the brigades itself, I do take your point. I think the Olliwe's testimony and the tie to Abu Ghassan, who was part of the brigades, and there's also, I would like to know, there's communications between the defendant and both Olliwe's and including, with regard to the Aldari communications, there's the, I was just referencing the email about the transmitters and receivers. There's also another email where he sent to Aldari explaining how he, or how Aldari and the quote resistance could protect their phones from spying. There's an email that I'm going to paraphrase badly about likening one of his lists or order to a shopping list, a shopping list for an IED. Do you remember what I'm talking about? Yes, certainly. Do you know who that was to or from? I believe that was from Aldari. I have to... Is Abu Ghassan in that email? I think he is. That's a fair question and I don't know the answer. But I did want to just point out one more thing, which is that Aldari was in possession of the defendant's passport, or a copy of it, which he had because the defendant had asked him to assist him in procuring a visa. So, you know, in addition to Aldari's own testimony, you have the documentary evidence connecting the two of them. And as a tact of downplaying Aldari's culpability, because she was so closely tied to the defendant by the evidence. And they say, they said in closing argument, for example, this is at pages 66, 90, and 91 of the ER. They talk about, they basically completely downplay his culpability, saying would the government have allowed a terrorist to come to the United States? Would Senator Lindsey Graham meet with, they don't use the word terrorist, but would meet with someone who is dangerous? So their entire strategy is downplaying Aldari's culpability because he is so closely tied to the defendant. And as a result, they chose not to use the chief of substitution or any of the offered stipulations that the government put there, because those are inculpatory and go directly opposed to their trial strategy. And I'd also, if I could address the issue of the State Department memos. The State Department memos, these are State Department memos, they're not prosecution team related documents. And in the memos, the... Are you talking about the consular documents? Yes, I am. Okay. Yes, the consular documents are memos. So one of them is to CBP, and two of them are internal State Department memos. And the memos, the consular official is saying, I keep getting calls from Washington, senior State Department people want to meet with this guy. Members of Congress want to meet with him. Can you, sorry, can you waive his inadmissibility or can you take him off the no-fly list? And I would point out the no-fly list, although they didn't put these in because they go directly counter to the defendant's theory, which is that the prosecution team let him into the United States. It wasn't the prosecution. I mean, since we're there, the record shows the post-attaché office and the FBI Phoenix field office have an interest in him and visiting the United States. They've had numerous contacts with him in relation to a terrorism case they're investigating. They expect him to go to trial next year. They anticipate they're going to use him as a witness. They want to use his visit in an opportunity to interview him further and on and on it goes. Yes, it does mention that. I'm not sure there's much more. I don't want to bore you. You know it very clearly. Yeah, yes, I have them, of course. And it's not just writ large, the State Department is facilitating this person's visit to Washington, D.C. to meet with leaders there. No, the memos... That FBI and FBI Phoenix knew about this individual and wanted to use him and meet with him for this trial. So what about that? So the memos clearly point out that there are various government interests in having him here. When it refers to the... Including for this trial, right? Including for this trial, yes. And for preparation for the trial. Of course, the FBI had met with him a couple times in Latvia and would have been able to... And in fact, the FBI and the prosecution team and the defense team went to Latvia for the deposition. So having him in the United States was not essential, but it was convenient. It was essential for him to meet with senior State Department officials, and it was essential for him to meet with members of Congress. And that... In any event... Essential? Well, I don't think... I'm sorry, go ahead. I don't think Senator Graham was going to go to Latvia to meet with them. And so if... But why was it essential that... Where did we get that from the record counsel? That he was definitely going to come, but he had to come. There's some imperative. Oh, no, I think maybe I misspoke. I'm saying it would... For him to meet with Senator Graham, he had to be in the United States. Senator Graham wasn't going to come. Sorry? But he didn't have to meet with Senator Graham. And this person was on the list, and we now see that strings were pulled to get him off of it. No, he... Your argument, as I understand it, from your brief, it makes... Really, one could come away with the understanding that the left hand didn't know what the right hand was doing. So to me, to just be clear about this, what these documents tell me is the left hand didn't know what the right hand was doing. If we're talking about what the prosecution team knew generally, that's why it's significant to me. I want to give you a chance to respond. But the FBI, Phoenix, knew about this. So the consular... The question is that you knew about this a year ahead of time, and why didn't you tell them? That's where we're getting to, Judge... I think that's what Judge Silver's talking about, is that the government was misleading. So now I'll be quiet and let you respond. Okay. So the consular was aware of the FBI's interest, and that is listed as... I guess the bottom line is the defense had the option to put these memos in the record or not, and they chose not to. And I think that is the strongest evidence that it was not inculpatory. And they did argue to the jury... Not exculpatory or not inculpatory? Sorry, that it was not exculpatory. Okay. Thank you. Thank you for that. But ultimately, I think that's the test of whether it was something that was exculpatory. Sorry, I've lost my train of thought. But yeah, I would just point out that... Sorry, the defense made these decisions, and they argued at trial that the prosecution had allowed him into the United States, when in fact, it was a much broader situation than that. And if they had thought that these documents supported their argument, they would have used them. And the same is true of ultimately the SIPA document that they used. So thank you, Your Honor. I'd like to ask the court to affirm counts one and two, and to return this case to trial. Okay. Hang on. I just want to review my notes and also give my colleagues an opportunity because I'm not sure they've had a chance to get an award. Do you have additional questions, Judge Clifton? No, I'm good. Thank you. I'm not necessarily done. Hang on one second. Yes. Does the government contend that the supplemental disclosure, the operative disclosure for expert grant... This is my last question, I think, for Graham would have complied with the amended Rule 16? Not necessarily. I think it is important to recognize that the rule has been amended, and we haven't done an analysis. And I would note that this court hasn't, as far as I know, hasn't interpreted the new rule. The old rules required a written summary of the opinions, and the new rule requires a complete statement of all opinions. So we haven't done the analysis as to whether it would comply with the new rule. We do believe it clearly complied with the old rule under this court's interpretation, and there was a pause. And we also would note that the prejudice from the testimony, but what they have not been able to do is argue they were prejudiced from the alleged lack of notice. They haven't, even five years later, come up with additional questions that they could have asked Mr. Graham. Now I'm done. Thank you, Your Honor. Thank you. Just very quickly about extraterritoriality. The government agreed to instruct the jury because they realized they hadn't presented such evidence. So I'm not sure perhaps the judgment should have reflected an acquittal on that count. As far as the testimony about whether Azari was a member of the brigade, had he been confronted with, while the government thinks you are, he would have squirmed. He would have had a, this would have really damaged his credibility. I'm not so sure of that. I mean, he's being very slippery. Of course he's being slippery. For him to be told, well, the government thinks you are, that's the government's impression, but that's not my impression. I just don't see the inconsistency that you think is there. Well, he took great pains in his emails. Sure, very slippery. He wanted to avoid being identified because he probably saw it as being the liar that you're trying to tell us the jury would have decided he was. Well, in his email to Agent Whitson, he repeatedly talked about how he was aligned with the United States and he loves the United States and he'd worked with the United States. Well, he's sucking up to the United States, talking to a United States agent. Does he want to say, and I'm a member of this group that's trying to fight US forces in Iraq. No, he doesn't want to say that. Not when he's trying to get a visa, but didn't the jury hear him testify that he provided financial assistance and logistical assistance to the brigades? Yes, but then when later asked, he clarified that and said, oh, I provided financial assistance to all Iraqis and whether they were brigades members or not, that he presented himself as just a wealthy, charitable man who wanted to help Iraqi refugees. He really didn't want to pinpoint himself as someone who was personally involved in the military aspect of the brigades. Counsel, it's a tough sell because he also went out of his way to say in his testimony that the jury heard about his grandfather, about how proud he was, and he thought that Ahmad had done nothing wrong and the brigades had done nothing wrong. I'm paraphrasing, admittedly, but I want to give you a chance to respond. They've done nothing wrong by trying to drive the Americans out. Right. I think he was trying to walk a very fine line by saying they did nothing wrong, but I wasn't involved in the military part of it, and basically trying to say, but if you think he did something wrong, because he knew that Mr. Elba had been charged with a crime here, but he was trying to walk a very fine line between not admitting to, presumably, not admitting to a crime and also defending his own family's honor and his own family's honor. So I think he was trying to walk a very fine line by not admitting to doing anything militarily and also maintain his own personal and familial pride. I agree exactly with that. So why does that lead a jury to decide he's a lying so-and-so, and you can't believe his testimony on other subjects? He's clearly testifying in his own interest, but how is the testimony that is damaging to your client going to be categorized by the jury in the same way? Well, if I think he's confronted directly with evidence where he says, oh, I wasn't involved in, people outside of Iraq aren't involved in military operations, and he said, I left Iraq in 2005, and that's when... But he acknowledges he helped inside Iraq as well as outside. He acknowledges financial assistance. He acknowledges support. He's proud of his family's involvement. It's not like he said, this is an alien group. I'm against them. He hasn't said anything like that at all. No, I'm just excusing military involvement, but I want to try to move on and just talk quickly about the other evidence did not attach Mr. Okla to any conspiracy against Americans. None of the emails were all in 2008 after there was a clear split between the brigade that started helping Americans and the brigades that worked against al-Qaeda and the part of the brigades that were still working against Americans. The Omar stuff had, yes, it had a fingerprint, but it had no connection. There was nothing in there showing that it was connected to the brigades, much less any anti-American sentiment or anything against the Americans. On that point, could I ask you, what about the testimony from that, I think it would have been through Graham, that a particular type of built-on multi-frequency board, the one that's dash 11, was consistently designed by your client, and that those had been used in attacks against Americans. What about that? Yes, that was some of his testimony that was disputed. That was the only testimony that was disclosed where he, that would be, that was the only disclosed testimony where he said this could only be used in IEDs. This was progressive testimony where none of those opinions were disclosed. And our expert explained that it's not that they could only be used in IEDs. It's just that that wouldn't be an off-the-shelf product because it was just, had been specialized that it only worked on one button. So just that it wouldn't be off the shelf, an off-the-shelf product. But we're not talking about a Best Buy and Southdale. We're talking about a secondhand electronics market and the, in Baghdad, in wartime, in the open market. So that doesn't, you know, so I think our expert's testimony on that was more consistent with, certainly was plausible and would have been consistent with the electronics shop that Mr., the defense plaintiff, Mr. Opa had. Finally, with respect to the 15H versus 15C deposition, the joint motion was clearly geared at explaining to the judge that this deposition was permissible under the rules of criminal depositions, that it would not be a discovery deposition. And under 15F, of which 15H is no exception, 15F says the deposition, the admission of the deposition is subject to the regular rules of, federal rules of evidence, that admissibility, that the addition, the decision to take a deposition does not govern admissibility. And in fact, the footnote two in the motion that recognizes that a confrontation clause objection is not yet right. And so if that, if other statements in the motion were in fact saying, and we are waiving all confrontation clause objections, then that footnote would be a nullity. And Judge Wake's order specifically cites 15F and says, this is subject to 15F. 15F, again, being the rule saying that depositions are subject to admissibility. Is there anything else you want to say to wrap up? I just say that this was a case where the defense had no opportunity for on the ground investigation. The event happened a decade, more than a decade before trial. The sense of the government's mercy and the government cut corners and denied the defendant a fair chance to defend himself and reacted to court of birth so that he has a chance to do that. Thank you. Thank you. We'll take another five minutes. You have careful preparation in your briefing. We appreciate it very, very much. And we're going to end the meeting.
judges: GRABER, CLIFTON, CHRISTEN